## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| FREDERICK CARLTON "CARL" LEWIS, | : : : | |
| Plaintiff, | : : | Civil Action No. 11-cv-2381 (NLH)(AMD) |
| v. | : : | **OPINION** |
| SECRETARY OF STATE KIM GUADAGNO, et al., | : : : | |
| Defendants. | : : | |

<u>**APPEARANCES**</u>:

William M. Tambussi, Esquire
John E. Wallace, Jr., Esquire
William F. Cook, Esquire
Christopher A. Orlando, Esquire
and
Michael Joseph Miles, Esquire
Brown & Connery L.L.P.
360 Haddon Avenue
Westmont, N.J. 08108
*Attorneys for Plaintiff Frederick Carlton Lewis*

Donna Kelly, Esquire
and
Robert T. Lougy, Esquire
Division of Law & Public Safety
Office of Attorney General of New Jersey
Richard J. Hughes Justice Complex
25 Main Street
P.O. Box 112
Trenton, N.J. 08625
*Attorneys for Defendants Kim Guadagno and Paula Dow*

Howard Lane Goldberg, Esquire
and
Sherri L. Schweitzer, Esquire
Office of Camden County Counsel
520 Market Street
Courthouse, 14th Floor
Camden, N.J. 08102

*Attorneys for Defendant Joseph Ripa*

James T. Dugan, Esquire
Atlantic County Department of Law
1333 Atlantic Avenue
8th Floor
Atlantic City, N.J. 08401
*Attorney for Defendant Edward P. McGettigan*

Mark D. Sheridan, Esquire
and
Mark C. Errico, Esquire
Drinker Biddle & Reath, L.L.P.
500 Campus Drive
Florham Park, N.J. 07932
*Attorneys for Intervenors-Defendants William Layton and Ted Costa*

**HILLMAN, District Judge**

Plaintiff, Frederick Carlton "Carl" Lewis, has brought suit against Defendants, New Jersey Secretary of State Kim Guadagno, New Jersey Attorney General Paula Dow, Camden County Clerk Joseph Ripa, Burlington County Clerk Timothy Tyler, and Atlantic County Clerk Edward P. McGettigan, alleging, *inter alia*, that his constitutional right to equal protection will be violated if he is prohibited from running as a candidate for New Jersey State Senate.  On appeal, the Third Circuit Court of Appeals preliminarily enjoined Defendants from removing Plaintiff's name from the ballot, thereby permitting Plaintiff's name to appear on the primary election ballot as a Democratic candidate for New Jersey State Senate in the 8th Legislative District.  Moreover, the Third Circuit remanded the matter to this Court, instructing the Court to consider Plaintiff's as-applied equal protection

2

claim.

Secretary of State Guadagno and Attorney General Dow (or, "Defendants") and Intervenors-Defendants, William Layton and Ted Costa (or, "Intervenors") have moved for summary judgment against Plaintiff's claims, asserting that Plaintiff's name should not appear on the ballot for New Jersey's upcoming general election. Plaintiff cross-moves for summary judgment in favor of his claims.

For the following reasons, the Motions for Summary Judgment filed by Defendants and Intervenors will be granted.  Further, Plaintiff's Cross-motion for Summary Judgment will be denied.

## I.   JURISDICTION

Plaintiff has brought federal constitutional claims pursuant to 42 U.S.C. § 1983, as well as a claim under New Jersey law. This Court has jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331, and may exercise supplemental jurisdiction over Plaintiff's related state law claim under 28 U.S.C. § 1367.

## II.   BACKGROUND

On April 11, 2011, Plaintiff, Frederick Carlton "Carl" Lewis,[1] in accordance with New Jersey election law, filed his nomination petition seeking to have his name placed on the ballot

---

[1]  Carl Lewis represented the United States in the 1984, 1988, 1992 and 1996 Olympic games.  He won nine gold medals in track and field and is considered by some as the greatest Olympian of all time.

for the June 7, 2011 Democratic Party Primary Election for the office of New Jersey State Senate, 8th Legislative District. Several days later, William Layton and Ted Costa, intervenors in this action, contested the validity of Plaintiff's candidacy. They specifically argued that Plaintiff did not meet the New Jersey Constitution's four-year durational residency requirement for the office of state senator.  After a hearing on April 20, 2011, an administrative law judge determined the challengers of Plaintiff's candidacy failed to prove that Lewis did not meet the residency requirement.  Several days later, on April 26, 2011, Defendant, Secretary of State Kim Guadagno,[2] reversed the

_____

[2] In New Jersey, the Secretary of State is appointed.  As in most states, the Secretary is the state's highest election official.  Defendant Guadagno also serves as the State's first elected Lieutenant Governor, elected to that position on a Republican slate that included Governor Chris Christie.  Whatever the wisdom of appointing an elected official to serve as Secretary of State may be, and there is much to counsel against it, the appointment does not violate state or federal law.  It also appears that of the forty-seven (47) states that have the position, thirty-five (35) are elected by statewide ballot and twelve (12) are appointed. http://ballotpedia.org/wiki/index.php/Secretary_of_State (last visited September 6, 2011).
        Plaintiff argues that Secretary of State Guadagno's dual role as the chief election officer and partisan elected official, coupled with certain comments and conduct by the Republican Governor, evidence that Plaintiff is the victim of a political vendetta and a skewed and biased application of the law.  This argument might have some merit, and might justify an inquiry into the decisional process, if the buck stopped at the desk of the Secretary of State, or if the Governor himself determined or had influence over the final determination of candidate qualifications.  Indeed, exercise of the power to regulate elections to gain a partisan advantage would be a gross and corrupt use of power.  Here, however, the issue of Plaintiff's

decision of the administrative law judge and concluded that
Plaintiff was not a resident of the State of New Jersey for the
constitutionally prescribed time period.  Thus, Plaintiff's name
was ordered removed from the ballot.

Plaintiff appealed Secretary of State Guadagno's decision to
the Appellate Division of New Jersey.  On May 2, 2011, the
Appellate Division affirmed the Secretary's decision to bar
Plaintiff's name from appearing on the primary ballot.  The next
day, Plaintiff moved before the Supreme Court of New Jersey for a
stay and sought certification to appeal the appellate panel's
decision.  The Supreme Court denied the stay and the petition for
certification.

During the course of those proceedings, Plaintiff filed a
Verified Complaint before this Court alleging that Secretary of
State Guadagno's decision violated the Equal Protection Clause of
the Fourteenth Amendment and the New Jersey Civil Rights Act.
Plaintiff additionally filed a Motion for a Temporary Restraining
Order and Order to Show Cause Why a Preliminary Injunction Should
Not be Entered.  After a hearing and oral argument on April 28,
2011, the Court denied Plaintiff's motion.  The Court

---

qualifications under state law was reviewed -- and the
disqualification upheld -- by the State's judiciary up to and
including its highest court.  This review by an independent
branch of government insulated from political influence or
partisan bias renders the argument of improper influence a
superficially attractive but ultimately irrelevant red herring.

supplemented its decision in its Opinion dated May 3, 2011.

Plaintiff appealed the Court's decision to the Third Circuit Court of Appeals.  In its Order dated May 5, 2011, the Third Circuit entered a preliminary injunction mandating that Plaintiff's name be included on the ballots, and remanded the case to this Court for purposes of analyzing Plaintiff's as-applied equal protection claim.[3]  On May 10, 2011, Plaintiff filed an Amended Verified Complaint.

On remand, Intervenors moved for summary judgment against Plaintiff's claims on June 3, 2011.  Days later, Defendants also moved for summary judgment.  Along with his opposition to Defendants and Intervenors' motions, on August 29, 2011, Plaintiff cross-moved for summary judgment.[4]  With this procedural history in mind, the Court turns to the following facts set forth by the parties as part of their motions for

---

[3] This Court's April 28, 2011 Opinion only addressed Plaintiff's facial challenge to the state constitutional provision at issue and expressly declined to address an as-applied challenge, believing that such a claim either had been heard -- or going forward would be best heard -- by the state courts hearing Plaintiff's claims.  As discussed more fully *infra*, the interim relief granted by the Court of Appeals was based on a claim that had not yet been fully presented or decided in any other court.

[4] On August 19, 2011, the Court held a hearing in this matter to address several issues, including Plaintiff's request for certain discovery.  For the reasons expressed on the record at that hearing, and in a separate order to be entered this date, the Court denied Plaintiff's request, specifically his request to depose Secretary of State Guadagno.

summary judgment and that are relevant to the analysis here.[5]

Plaintiff first moved to the State of New Jersey while an infant in 1963. Until 1979, Plaintiff resided with his parents in Willingboro.[6] He attended school in Willingboro, competed as a track and field athlete in school and as a member of the Willingboro Track Club, and ultimately, in 1979, graduated from Willingboro High School. Thereafter, beginning in 1979, Plaintiff accepted a scholarship and competed as a collegiate track and field athlete at the University of Houston, in Houston, Texas. He continued to reside in the State of Texas until approximately 1999, when he moved to the State of California. In 1999, he purchased a home in California. As of November 8, 2007, Lewis owned three homes in California, for which he paid taxes and utilities. Also, at that time, Lewis was registered to vote in California, a right he exercised thrice in 2008 and once in 2009. Between 2002 and 2008, and possibly including 2009, Plaintiff paid income taxes in California. Plaintiff maintained a business, the Carl Lewis Foundation, in California where it had

---

[5] In light of its disposition of the pending motions, the Court resolves any factual disputes in favor of Plaintiff and accepts Plaintiff's proffered facts as true for purposes of these motions.

[6] Willingboro is located in the southernmost part of Burlington County. Although not in the 8th Legislative District as presently reconstituted, it is very close geographically.

been incorporated in 2001.[7]  In September 2010, he filed an annual report indicating that his foundation continued to pay taxes in California.  In May 2008, Plaintiff executed an amended deed on his New Jersey property in which he identified his address in California.

In addition to his contacts with the State of California, Plaintiff has also maintained significant connections with the State of New Jersey.  Throughout his collegiate career at the University of Houston and during his professional athletic career, Plaintiff returned repeatedly to New Jersey to visit and stay with his parents in Willingboro, as well as to attend track meets in the area.  In 1997, after he retired from professional competition, Plaintiff continued to frequent his former home state.  In 1999, he participated in an event to celebrate the millennium in Willingboro.  In 2000 and 2001, Plaintiff assisted in community fund-raising efforts to save Willingboro High School's track, known as Carl Lewis Stadium.  Pursuant to Plaintiff's request, the athletic apparel company, Nike, contributed a significant amount of money to renovate and resurface the track.  Plaintiff appeared in Willingboro in support of the campaign.  Thereafter, in 2003 and 2004, Plaintiff

---

[7] According to Plaintiff, the Carl Lewis Foundation "promotes fitness, lifestyle, health and education for youth and families," "donates money for uniforms and equipment," and "mentors children and provides scholarships."  (Pl. Cross-mot., at 11-12).

visited every public school in Willingboro to speak with students, an endeavor he continues to pursue to this day.

In 2005, Plaintiff purchased two condominiums in Mount Laurel, New Jersey, one for his mother and the other for himself. Ever since then, he has paid property taxes and utilities for his condominium and property taxes for his mother's condominium. With the intent to permanently reside in New Jersey, Plaintiff began to move his vehicles, personal belongings, and other things from California to New Jersey in October 2005. Also in or around that time, Plaintiff purchased a vehicle in New Jersey to use in the State; he sold his home in Texas; and in 2006, he obtained a New Jersey driver's license. In August 2007, Plaintiff bought a home in Medford, New Jersey, and transferred his belongings from his condominium in Mount Laurel to his new residence in Medford. Plaintiff continues to reside in the Medford home, for which he pays property taxes and utilities, while renting the Mount Laurel condominium. In the autumn of 2007, Plaintiff started to relocate his Carl Lewis Foundation to New Jersey, with its office and principal functions now situated in Willingboro.

Also during 2007, Plaintiff became a volunteer assistant track coach at Willingboro High School. He has regularly attended practices and track meets. During the subsequent years, he has been actively involved with Willingboro High School, speaking with and mentoring students, establishing and presenting

scholarships, and appearing at and arranging student events. Beginning in May 2009, for example, he hosted the annual Carl Lewis Relay Championships, which are held at Carl Lewis Stadium in Willingboro.

Since 2009, Plaintiff has attended church in Camden, New Jersey.  In 2009, he also established in New Jersey a chapter of an organization called Best Buddies, which encourages volunteerism and opportunities for mentally and physically disabled people.  That same year, Plaintiff was elected into the New Jersey Hall of Fame.  More recently, in April 2011, Plaintiff registered to vote in New Jersey.

**III.**   **DISCUSSION**

   **A.**   **Standard for Summary Judgment**

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56.

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing

10

substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor."  Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.  Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.  Anderson, 477 U.S. at 256-57.  A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements.  Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

**B.  Equal Protection Claim**

The Equal Protection Clause to the Fourteenth Amendment to the United States Constitution provides that "[n]o State shall make or enforce any law which shall . . . deny to any person

within its jurisdiction the equal protection of the laws."  U.S.
Const. Amend. XIV, § 1.  When determining whether a law violates
the Equal Protection Clause, three elements are paramount: "the
character of the classification in question; the individual
interests affected by the classification; and the governmental
interests asserted in support of the classification."  Dunn v.
Blumstein, 405 U.S. 330, 335 (1972).  Moreover, the standard of
review for an equal protection claim varies depending upon the
scope of, and burden imposed by, the law in question.  "If state
action does not burden a fundamental Constitutional right or
target a suspect class, the challenged classification must be
upheld if there is any reasonably conceivable state of facts that
could provide a rational basis for the classification."  Doe v.
Pa. Bd. of Prob. & Parole, 513 F.3d 95, 107 (3d Cir. 2008)
(citation and internal quotation marks omitted).  "If the
challenged state action involves a 'suspect' classification based
on race, alienage or national origin, or infringes on a
fundamental constitutional right, [the court] must apply the
strict scrutiny standard."  Id.

Accordingly, as a threshold matter, and vital to the Court's
analysis, the parties dispute the appropriate standard of review
applicable to Plaintiff's equal protection claim.  The Court
therefore will address the standard of review before turning to
the merits of Plaintiff's as-applied challenge to New Jersey's

durational residency requirement.

### 1.   Standard of Review

Plaintiff argues that given the severe restriction it imposes upon citizens' rights to vote and Plaintiff's right to travel, the durational residency requirement at issue must be subjected to strict scrutiny.  Conversely, Defendants and Intervenors submit that the residency requirement does not implicate the fundamental rights to vote or travel, but merely impacts an individual's ability to run for political office, which in and of itself does not amount to a constitutional right. Because the residency requirement does not restrict on the basis of some impermissible classification, Defendants and Intervenors surmise that only a rational basis review is appropriate under these circumstances.

In <u>Bullock v. Carter</u>, 405 U.S. 134 (1972), the Supreme Court of the United States held that the imposition of a filing fee as a condition to having a political candidate's name placed on a ballot in a primary election violated the Equal Protection Clause.  At the outset of its analysis, the Supreme Court had to choose what level of scrutiny to apply to the Texas filing-fee requirement.  <u>Id.</u> at 142.  The Court explained:

> The initial and direct impact of filing fees is felt by aspirants for office, rather than voters, and the Court has not heretofore attached such fundamental status to candidacy as to invoke a rigorous standard of review. However, the rights of voters and the rights

13

of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters.  Of course, not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review.  <u>McDonald v. Board of Election</u>, 394 U.S. 802 (1969).  Texas does not place a condition on the exercise of the right to vote, nor does it quantitatively dilute votes that have been cast.  Rather, the Texas system creates barriers to candidate access to the primary ballot, thereby tending to limit the field of candidates from which voters might choose.  The existence of such barriers does not of itself compel close scrutiny.  Compare <u>Jenness v. Fortson</u>, 403 U.S. 431 (1971), with <u>Williams v. Rhodes</u>, 393 U.S. 23 (1968).  In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters.

<u>Id.</u> at 142-43 (footnotes omitted).  The Supreme Court determined that the filing-fee requirement must withstand close scrutiny because the requirement, in essence, served as an "exclusionary mechanism" that precluded potential candidates from running for office simply due to their inability to afford a considerable, initial fee.  <u>Id.</u> at 143-44.  That imposition upon potential candidates, in turn, "substantially limited" voters' choice of candidates by burdening, and perhaps proving cost prohibitive to, office seekers of modest means who do not attract sizeable contributions from their supporters.  <u>Id.</u> at 144.  The filing-fee requirement essentially eliminated what otherwise might have been highly qualified candidates, for whom voters may have cast their

ballots, merely because of the candidates' financial constraints.[8]

The significance of <u>Bullock</u> in this matter is its conclusion that a restriction placed upon political candidates does not warrant heightened scrutiny unless the restriction substantially interferes with or disrupts the right to vote, severely distorts the political playing field, or otherwise offends another constitutional right.  In other words, standing alone, there is no fundamental, unfettered right to pursue public office.  <u>See id.</u> at 142-43; <u>Hankins v. State of Hawaii</u>, 639 F. Supp. 1552, 1555-56 (D. Haw. 1986) (finding that the right to run for or hold public office is not a fundamental constitutional right).  Only when a restriction on candidacy threatens serious harm to a cognizable constitutional right or freedom must that restriction endure strict scrutiny; otherwise, the restriction simply must have a rational basis to justify it.[9]

_____

[8] In essence, the state law at issue in <u>Bullock</u> created two tiers, or wide classes, of potential candidates -- those rich enough to run and those who could not afford the exorbitant filing fees.  In some cases the filing fee was a substantial percentage of the salary of the office sought by the candidate. Although the impact on voters was derivative of the rights of the candidates who could not afford to run, it is not surprising that the Court would apply a strict scrutiny analysis to a state scheme which had the effect of barring the poor from participating in our democracy by limiting the opportunity to seek public office to the wealthy.  There is no rational basis, much less a compelling one, to limit participation in political life based on economic status.

[9] In further support of the conclusion that rational basis review is appropriate to evaluate a law restricting an individual's right to candidacy, absent any invidious

Numerous cases, including several cited by the parties here, illustrate, either expressly or tacitly, the need for strict scrutiny of restrictions on candidacy only when those restrictions substantially and appreciably impact constitutional rights or basic political freedoms independent of the candidate's ability to run for public office.  For instance, the Texas filing-fee requirement in <u>Bullock</u> garnered close scrutiny because, by its nature, it arbitrarily eliminated candidates of modest means and therefore profoundly disturbed citizens' fundamental rights to vote for candidates of their choice.

In <u>Dunn v. Blumstein</u>, 405 U.S. 330 (1972), a durational residency requirement failed under a strict scrutiny analysis and thus violated the Equal Protection Clause.  But that residency requirement, in complete contrast to the one at issue here, applied directly to residents' fundamental right to vote; the

---

discrimination or infringement of a constitutional right, the Court notes the plurality opinion of the Supreme Court in <u>Clements v. Fashing</u>, 457 U.S. 957 (1982).  In that case, a plurality of the Court explained: "Far from recognizing candidacy as a 'fundamental right,' we have held that the existence of barriers to a candidate's access to the ballot 'does not itself compel close scrutiny.'" <u>Id.</u> at 963 (Rehnquist, J., plurality) (quoting <u>Bullock</u>, 405 U.S. at 143).  In <u>Clements</u>, the Supreme Court upheld a Texas state statute that barred certain state officers with more than a year remaining on their elected or appointed terms from running for the state legislature.  The plurality went on to hold: "We conclude that this sort of insignificant interference with access to the ballot need only rest on a *rational* predicate in order to survive a challenge under the Equal Protection Clause." <u>Id.</u> at 968 (emphasis added).

requirement in Dunn had nothing to do with candidates running for public office.  In Williams v. Rhodes, 393 U.S. 23 (1968), the Supreme Court closely scrutinized and, under equal protection principles, struck down an Ohio statutory scheme that effectively prohibited the creation of new political parties independent of the Democratic and Republican parties.  Those restrictions, the Court reasoned, impede the fundamental rights to associate and vote, and wilt under strict scrutiny given the disparate, heavy burdens they impose on minority political groups to the benefit of the established two-party paradigm.  Id. at 31-32.  Like the burdensome financial hurdles at issue in Bullock, the state scheme in Rhodes represented a deep and systemic defect designed to maintain the political status quo and exclude whole classes of groups and individuals who might seek to challenge the established order.  In Turner v. Fouche, 396 U.S. 346 (1970), the Supreme Court deemed unconstitutional the compilation of a grand jury list and, under a more lenient standard of review, the membership requirements for a school board.  However, in that case, the Court noted that the violations of equal protection were not linked to some right to public service, but rather to the unassailable right to be free of racial discrimination and other invidiously discriminatory qualifications.  Id. at 359-63.

All of those cases employing heightened scrutiny are materially different and distinguishable from the present matter.

Here, the durational residency provision requires that any and
all persons aspiring for the office of state senator in the State
of New Jersey must have been a citizen and resident in the State
for at least four years before the election.  See N.J. Const.
Art. 4, § 1, ¶ 2.  Therefore, on its face, the residency
requirement governs all individuals fairly and equally, without
regard to or reliance on any suspect classification.  It demands
that any person, irrespective of his or her natural attributes,
beliefs, opinions, or proclivities, be immersed in the civic,
social, and political fabric of New Jersey for a specific period
of time in order to qualify as a candidate for one of the State's
highest offices.  Further, the constitutional mandate has an
appreciable impact on only certain, aspiring political candidates
-- i.e., those who have not resided, as defined by state law,
within New Jersey's borders for four years before election -- and
not voters, political parties, or persons with particularized
views or minimal wealth.  Unlike the restrictions overturned in
Bullock, Rhodes, and Turner, the durational residency requirement
does not shrink the pool of political candidates so profoundly,
and on such arbitrary or impermissible grounds such as financial
status, political opinion, or membership in a protected class, as
to undermine fundamental rights and privileges, including the

rights of voters.[10]

On the contrary, a durational residency requirement for aspirants of state political office has nothing more than a minor, incidental impact on the rights of citizens to vote.  That fact alone does not warrant strict scrutiny.  After all, citizens do not have an unfettered right to select *any* person of their choosing for public office.  The institution of qualifications and restrictions for political elective office are nearly universal, see, e.g., U.S. Const. Art. II, § 1, cl. 5 (fourteen-year residency requirement for President); Art. I, § 2, cl. 2 (seven-year residency requirement for congressional representative); Art. I, § 3, cl. 3 (nine-year residency requirement for senator), and present an acceptable means to ensure the legitimacy, suitability, and integrity of our political leaders and public servants.  In the universe of

---

[10] The durational residency requirement also cannot be said to violate Plaintiff's right to travel because the provision, limited in its scope and duration, in no way penalizes Plaintiff from exercising that right.  Because candidacy for political office is not a fundamental right, Plaintiff is not being forced to choose between his right to travel and another constitutional entitlement or freedom.  See Hankins, 639 F. Supp. at 1555 (finding that a durational residency requirement for candidacy does not "penalize," and thus violate, the potential candidate's right to travel because the candidate need not choose between exercising different fundamental rights).  Rather, the residency requirement here merely delays Plaintiff from running for New Jersey state senator until he has chosen to reside in the State for four years leading up to the election.  That choice falls entirely within Plaintiff's purview, and does not impede his ability to indulge in any rights afforded to him by the Constitution or any other law.

political qualifications and restrictions, a durational residency requirement is among the fairest and most circumscribed ways in which to regulate a pool of candidates without encumbering individual rights and freedoms.

In sum, because New Jersey's durational residency requirement for the office of state senator does not substantially or severely impede the fundamental, constitutional rights of potential candidates, voters, or anyone else, the requirement, to withstand an equal protection challenge, must "bear[] a rational relationship to some legitimate end" -- that is, the requirement is constitutional if "'any reasonably conceivable set of facts [] could provide a rational basis for' it." Doe, 513 F.3d at 107 (quoting FCC v. Beach Commc'ns, 508 U.S. 307, 313 (1993)).  Mindful of this standard, the Court will turn to the merits of Plaintiff's as-applied cause of action.

### 2.  As-Applied Analysis

At the conclusion of the April 28, 2011 hearing and in its Supplemental Opinion dated May 3, 2011, this Court denied Plaintiff's request for a preliminary injunction, finding that he failed to show a likelihood of success on the merits of his equal protection claim.[11]  The Court, however, made clear that it

---

[11] To the extent necessary to resolve the motions for summary judgment and for purposes of this Opinion, the Court adopts and reiterates its reasoning set forth at the April 28, 2011 hearing and in its Supplemental Opinion.  In so doing, the Court again finds in favor of Defendants and Intervenors concerning any

understood and considered Plaintiff's claim as only a facial
challenge to New Jersey's durational residency requirement.  On
appeal, the Third Circuit entered a preliminary injunction in
Plaintiff's favor and directed this Court, on remand, to consider
Plaintiff's as-applied equal protection claim.  "An as-applied
attack . . . does not contend that a law is unconstitutional as
written but that its application to a particular person under
particular circumstances deprived that person of a constitutional
right."  United States v. Marcavage, 609 F.3d 264, 273 (3d Cir.
2010).

According to Plaintiff, his history and ongoing connections
with the State of New Jersey, his current residency, and his
substantial involvement in public affairs demonstrate that, as
applied to him, the durational residency requirement is
unconstitutional.  Plaintiff attests to his close ties to the
State and its people and institutions.  In support of his claim,
Plaintiff has thoroughly and painstakingly articulated details of
his childhood and adolescence, his family, his amateur and
professional athletic careers, his home ownership and residency,
his tax obligations, his volunteerism and community service, and
his other endeavors and general reputation in the State.  Through
those connections and contributions, Plaintiff believes that he

---

facial challenge asserted by Plaintiff against New Jersey's
durational residency requirement.

is intimately familiar with the residents of New Jersey and their concerns, and, in turn, they are familiar with him.[12]

Defendants and Intervenors counter that notwithstanding his connections with the State, Plaintiff simply cannot satisfy the durational residency requirement and the purposes and policies animating it.  By their assessment, Plaintiff, on account of his prolonged absence away from New Jersey, is not sufficiently familiar with the State and its citizens, nor are its citizens sufficiently familiar with him as a potential candidate, to find that the residency requirement as applied to him violates the Equal Protection Clause.

Article 4, Section 1, Paragraph 2 of the New Jersey Constitution reads, in pertinent part, that "[n]o person shall be a member of the Senate who shall not . . . have been a citizen and resident of the State for four years . . . before his election."  N.J. Const. Art. 4, § 1, ¶ 2.  The justifications for New Jersey's durational residency requirement, according to Defendants and Intervenors, is two-fold: the State has a paramount interest in ensuring that (1) its candidates for State Senate are familiar with their constituents and the concerns and issues relevant to New Jersey, and (2) its citizens are familiar with their candidates and the platforms, ideas, and opinions

---

[12] In the uncontested Democratic primary held June 7, 2011, Plaintiff received 2,418 votes.

espoused by those candidates.  Unquestionably, those interests

formulate a rational basis for the policy encompassed by Article

4, Section 1, Paragraph 2 of the New Jersey Constitution.  See

Hankins, 639 F. Supp. at 1556 ("Indisputably, candidates who

possess a familiarity with, and an awareness of, local conditions

are a commodity desirable to state residents.  That the voters

are more likely to come into personal contact with the

candidates, prior to election, if a residency requirement is

imposed is also self-evident."); Sununu v. Stark, 383 F. Supp.

1287, 1290 (D.N.H. 1974) (finding compelling state interests in

durational residency requirements, including the interests

"first, to ensure that the candidate is familiar with his

constituency; second, to ensure that the voters have been

thoroughly exposed to the candidate; and third, to prevent

political carpetbagging"), aff'd mem., 420 U.S. 958 (1975).[13]  The

importance of the durational residency requirement is reflected

by its inclusion in the New Jersey Constitution for approximately

167 years, and the decision of the people of New Jersey not to

amend or delete it over that time.

    Notwithstanding its history and purpose, the question

remains, does New Jersey's otherwise valid, constitutional

---

[13] The Court also refers to and incorporates its May 3, 2011
Supplemental Opinion for further examination and explanation of
the justifications and purposes underlying the durational
residency requirement.

residency requirement violate the Fourteenth Amendment when applied to Plaintiff and his particular set of circumstances? The Court finds that it does not.  Central to the resolution of that question is not whether Defendants and Intervenors have articulated a sufficient empirical justification for the provision's existence and application.  They have no such burden. See Munro v. Socialist Workers Party, 479 U.S. 189, 194-95 (1986) (noting that a state need not "make a particularized showing" to support the enforcement of reasonable restrictions on ballot access); see also Timmons v. Twin Cities Area New Party, 520 U.S. 351, 364 (1997) (stating that the court does not "require elaborate, empirical verification of the weightiness of the State's asserted justifications").  Nor is the pertinent consideration whether Plaintiff has averred sufficient facts to somehow undermine those legitimate, rational justifications.[14]

_____

[14] This Court will not address whether Secretary of State Guadagno properly interpreted New Jersey's durational residency requirement and reasonably determined that Plaintiff did not satisfy that requirement.  Secretary of State Guadagno's determination of Plaintiff's residency and citizenship was affirmed by the Appellate Division, and the New Jersey Supreme Court denied certification regarding that matter.  That issue, one solely of state law, was fully and fairly litigated by the parties and reviewed by the State's highest court.  This Court is precluded from reexamining those decisions.  See M & M Stone Co. v. Commonwealth of Pennsylvania, 388 F. App'x 156, 161 (3d Cir. 2010) ("With regard to issues first presented to a state tribunal, the federal courts have consistently accorded preclusive effect to issues decided by state courts, and, thus 'res judicata and collateral estoppel not only reduce unnecessary litigation and foster reliance on adjudication, but also promote the comity between state and federal courts that has been

Stated differently, Plaintiff does not undermine a state constitutional provision designed to insure voter familiarity generally by merely offering evidence, or even proving, that voters are sufficiently familiar with him.[15]   Rather, the relevant

_____

recognized as a bulwark of the federal system'" (quoting <u>Allen v. McCurry</u>, 449 U.S. 90, 95-96 (1980))).  Under more ordinary circumstances, principles of comity and, more specifically, New Jersey's entire controversy doctrine might also preclude this Court's consideration of an as-applied challenge.  <u>See</u> <u>Paramount Aviation Corp. v. Agusta</u>, 178 F.3d 132, 137 (3d Cir. 1999) ("Under the entire controversy doctrine, a party cannot withhold part of a controversy for separate later litigation even when the withheld component is a separate and independently cognizable cause of action.").  As all litigants do in state court, Plaintiff had an obligation to assert all valid bases for relief in one proceeding and be barred from raising them in later proceedings.  The state courts are fully competent to apply federal law principles of equal protection.  However, under the unique procedural history of this case, application of that rule would work an inequity.  <u>See</u> <u>id.</u> ("As an equitable doctrine, [the entire controversy doctrine's] application is flexible, with a case-by-case appreciation for fairness to the parties."); <u>Circle Chevrolet Co. v. Giordano, Halleran & Ciesla</u>, 662 A.2d 509, 513 (N.J. 1995) (noting that use of the entire controversy doctrine "is discretionary and clarification of the limits of the doctrine is best left to case-by-case determination").  Therefore, the Court considers only the merits of Plaintiff's as-applied constitutional challenge to the durational residency requirement -- not the adequacy of the Secretary's findings and judgment related to Plaintiff's residency and citizenship.

[15] If this Court were to frame the issue as Plaintiff has, trial courts faced with as-applied challenges to this and similar provisions would have to substitute their own judgment on a case-by-case basis as to whether the particular candidate's knowledge of the community and the community's familiarity with the candidate met some undefined and undefinable standard.  Where would that line be drawn?  Would every judge draw it in the same place?  Would it be enough to be merely famous?  Would some qualities or organizational affiliations be favored more highly than others?  Would having some public facility bear your name be a necessary requisite or merely sufficient?  The effect would not be the laudable and necessary goal of equal protection but rather

constitutional inquiry is whether Plaintiff has carried his considerable burden to demonstrate that a facially neutral, non-discriminatory state constitutional mandate nonetheless has deprived him of a constitutional right, or unduly burdened such a right, because of his unique personal circumstances or characteristics.

This Court holds that the durational residency requirement does not in any way discriminate against Plaintiff or deprive him of fundamental rights to which he is entitled. By failing to satisfy the New Jersey residency requirement at issue, Plaintiff is not precluded from participating in the political process, from voting for or supporting particular candidates, from advocating for or contributing to certain causes, from associating with certain groups or lobbies, or from running for another political office, including the New Jersey General Assembly. Likewise, he may exercise his rights to speak freely, to assemble peaceably, and to travel widely. The only impediment Plaintiff suffers as a result of the residency requirement is

---

the opposite -- the ad hoc application of an arbitrary and capricious standard by the branch of government least responsive to the public at large. As between an unelected federal judge -- even one sworn to uphold the Constitution -- and a state constitution, it is for the latter and not the former to set the qualifications for state office. See Munro, 479 U.S. at 195 (expressing concern about "endless court battles" over the sufficiency of factual predicates to reasonable state provisions); Sununu, 383 F. Supp. at 1290-91 (lamenting the lack of discernable judicial standards in judging durational residency terms).

enjoinment from pursuing the New Jersey office of state senator, and only then until he has been a citizen and resident in New Jersey for four years.  Thus, the restriction is not permanent, but limited to a relatively short temporal period.  Indeed, it is difficult to imagine many electoral restrictions narrower in their restraint than the one at issue.

Given the durational residency requirement's importance, as well as its state constitutional dimension,[16] and the incidental, minimal burden it imposes on Plaintiff, the Court cannot find that Plaintiff has sufficiently demonstrated why, under equal protection jurisprudence, he should be excepted from the application of a New Jersey state constitutional provision reasonably related to legitimate, even compelling, state interests concerning a matter entrusted entirely to a state

---

[16] It is, of course, a truism that a state has no more a right to violate the Federal Constitution in its own constitution than it does in any other exercise of state power.  That having been said, state constitutions are different in kind from other state action.  Unlike unilateral action by a state executive or the enactment of a state statute by elected representatives, which may or may not reflect the will of the people, the provisions of a state constitution reflect the direct vote of the citizens.  On one level, the dispute in this case can be fairly characterized as whether the desire of some voters in the 8th Legislative District to vote for Plaintiff should trump the decision of the majority of statewide voters who approved the durational residency requirement.  While this Court, or any federal court, should not hesitate to vindicate the checks and balances inherent in the Fourteenth Amendment, it should be equally reluctant to intrude into sensitive matters reserved by the Tenth Amendment to the sovereignty of the state.  See Sununu, 383 F. Supp. at 1290-91.

sovereignty -- the qualifications of its own political office holders and elected officials.  Plaintiff supposes that his individual attributes and experiences should exempt him from the residency requirement, but that simply is not the case here.  The Court respects and commends Plaintiff for his athletic, professional, and altruistic achievements.  Indeed, those kinds of achievements and the personal qualities and attributes necessary to accomplish them may make Plaintiff an attractive candidate for political office and, perhaps one day, an effective public official.  Nothing in the State Constitution or this ruling preclude him from running for a whole host of important local and county offices as well as for the State Assembly.  But his accomplishments and connections to New Jersey do not excuse Plaintiff from having to reside in the State and commit himself as a citizen of New Jersey within its territorial borders for the unique and special office of state senator.

As explained in this Court's Supplemental Opinion dated May 3, 2011, the position of state senator in the State of New Jersey is entrusted with immense authority and responsibility.  To properly employ those powers and perform those functions, a senator must be intimately familiar with the State -- its people, government, institutions, businesses, history, culture, strengths, and weaknesses.  Likewise, for the State's citizens to effectively choose their senators, those citizens must have the

opportunity to learn about their senatorial candidates, including their political platforms and plans for the State.  The durational residency requirement -- and, by extension, the citizens of New Jersey, as illustrated by their approval of the requirement's inclusion in the New Jersey Constitution -- assumes that the requisite manner and degree of familiarity between citizen and candidate cannot occur unless, or at least is more likely to occur when, the senatorial office seeker lives in the State and among its people, where the candidate can experience with his or her constituents hardship and prosperity, challenge and accomplishment, disappointment and pride.  For all that he has done, Plaintiff has not proven that his particular involvement with the State of New Jersey sets him apart from all others who must reside in the State for four years to acquire the knowledge and familiarity of the State that the New Jersey Constitution and the New Jersey citizenry asks of its senators.

This irony in Plaintiff's position -- that his fame and civic involvement are such that he may leap ahead of other local leaders known in their communities who must wait the requisite waiting period -- is highlighted by the decisions in <u>Hankins v. State of Hawaii</u>, 639 F. Supp. 1552 (D. Haw. 1986) and <u>Sununu v. Stark</u>, 383 F. Supp. 1287 (D.N.H. 1974).  Though neither of those cases expressly addressed an as-applied challenge, in both of them the courts determined that the durational residency

29

requirements for state public office did not violate the equal
protection rights of the plaintiffs, both of whom had significant
connections to their respective states.  For instance, in
Hankins, the plaintiff, who sought to run as a candidate for
governor, had resided in Hawaii for seventeen years, including
the three years preceding his candidacy.  Hankins, 639 F. Supp.
at 1553.  Nevertheless, the district court rejected his equal
protection claim against the five-year residency requirement
enunciated in the state constitution.  Id. at 1556-58.

Similarly, in Sununu, the plaintiff, seeking to become a
state senator, had been a resident in New Hampshire for more than
four-and-a-half years, during which time he served as the
chairman of the municipal water and sewer planning committee and
of the municipal planning board, and had been elected to
represent the municipality in the New Hampshire General Court.
Sununu, 383 F. Supp. at 1289.  Despite the length of his
residency and his multiple roles in government and public
service, including an elected position, a three-judge panel of
the district court rejected his equal protection claim against
the seven-year residency requirement set forth in the state
constitution.  Id. at 1290-92.

On this record, to conclude that Plaintiff is exempt from a
durational residency requirement that is materially similar to
and indeed shorter in duration and thus less onerous than those

30

constitutionally valid residency requirements described in
Hankins and Sununu, the Court would have to reach a result
inconsistent with the aforementioned authority -- including a
case, Sununu, that had been summarily affirmed by the United
States Supreme Court.  See Sununu v. Stark, 420 U.S. 958 (1975).[17]
The fact is, given their residencies within their respective
states and their political involvement, the plaintiff-candidates
in Hankins and Sununu were as qualified as Plaintiff, if not more
so.

While the Sununu decision did not address an as-applied
challenge expressly, the decision recited Sununu's individual
attributes for the office in question and his extensive
connection with the political life of his state.  The scope and
underlying rationale of that decision is clear.  A rational,
evenly applied, state constitutional provision that does not
preclude, but merely delays, candidacy for a particular state
office -- even to one who already holds a significant elected
office -- does not offend the Federal Constitution.  Simply put,

---

[17] A summary affirmance is a decision of the Supreme Court
affirming the merits of a lower court's judgment.  See
Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 499 (1981)
("This Court has repeatedly stated that although summary
dispositions are decisions on the merits, the decisions extend
only to the precise issues presented and necessarily decided by
those actions." (citation and internal quotation marks omitted));
see also Hicks v. Miranda, 453 U.S. 332, 344-345 (1975) (noting
"that the lower courts are bound by summary decisions by this
Court until such time as the Court informs them that they are
not" (citation and internal quotation marks omitted)).

barring Plaintiff from running from state senate would not be unfair, would not preclude him from other public office, and would be wholly consistent with the existing legal precedents. On the other hand, while it is not direct precedent given the legal analysis applied, it is difficult to see how allowing Plaintiff to run for state senator would be fair to John Sununu or logically consistent with the restrictions placed on him and approved by the United States Supreme Court.  Until it is overturned -- or, at a bare minimum, undermined by intervening authority of sufficient clarity, which the Court has looked for and cannot find -- it is not for this Court to ignore the spirit and import of the <u>Sununu</u> decision.  This Court holds that Plaintiff's connections to New Jersey, including his good deeds and notoriety, do not place him beyond a constitutional restriction that applies to anyone and everyone who seeks to become a New Jersey state senator.[18]

It is tempting in this case to wish for, or to seek a path to, a different result than the one determined in this Opinion.

---

[18] Intervenors assert that should the rational basis standard not apply, the Court should employ the balancing test articulated in <u>Rogers v. Corbett</u>, 468 F.3d 188 (3d Cir. 2006).  The weighing process requires a court to "consider what burden is placed on the rights which plaintiffs seek to assert and then [] balance that burden against the precise interests identified by the state and the extent to which these interests require that plaintiffs' rights be burdened."  <u>Id.</u> at 194.  Were the Court to apply that balancing analysis, the reasoning and outcome would be the same as here.

The plaintiff is a man of great and inspiring achievement, justifiably held in high regard, and possessed of promise for the future.  More importantly, he is the candidate of choice of his political party.  And it is more than just a populist notion -- indeed it is ingrained in our collective political DNA -- to level the playing field, to welcome all comers, and to root for the underdog.  If constitutional law in the area of elections can be neatly summarized, it is certainly the case that for at least the last fifty years our courts have been, and ought to be, more than a little skeptical of state machinations to preserve and perpetuate the status quo of entrenched powers and ever vigilant against discrimination in all its sinister forms.  If any presumption would apply here, it would work to remove barriers to speech and active participation in political life, not fortify them, and to jealously guard the franchise on behalf of the voting public.

But against the clamor, and the hue and cry of the editorial board, must be balanced an equally powerful and fundamental premise -- that our democracy is one of laws, not men.  The citizens of the State of New Jersey, exercising their constitutional right in our federalist system to formulate their own government, have chosen and left undisturbed a universally applied and neutral prerequisite to hold the office of state senator.  The durational residency requirement applies to all,

regardless of economic status, race, creed, color, age, gender, and political affiliation.  And it applies, has been applied, and ought to be applied, equally to the famous and the obscure, to the overachiever and the pedestrian, to the athletically gifted and the passive observer.  Its populist appeal, and its democratic strength, lies in its universalism and objective application.  In that way it vindicates an equally strong principle of constitutional law -- the corollary to equal protection is equal application to all.

Therefore, for the reasons stated above, the Court rejects Plaintiff's equal protection claim.  Accordingly, the Court grants summary judgment in favor of Defendants and Intervenors. Further, Plaintiff's cross-motion for summary judgment is denied.[19]

## IV.   CONCLUSION

For the foregoing reasons, Defendants and Intervenors' Motions for Summary Judgment are granted.  Further, Plaintiff's Cross-motion for Summary Judgment is denied.

Date September 6, 2011                  /s/ NOEL L. HILLMAN
At Camden, New Jersey              NOEL L. HILLMAN, U.S.D.J.

---

[19] Plaintiff also sets forth a cause of action under New Jersey's Civil Rights Act.  That claim, too, cannot survive summary judgment because Plaintiff has failed to prove a violation of a constitutional or statutory right.

34